J-S35035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                    :              PENNSYLVANIA
                                                      :
             v.                             :
                                                      :
ANDREW POOLE,                       :
                                                      :
            Appellant            :     No. 1711 EDA 2019

Appeal from the PCRA Order Entered May 22, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002735-2008

BEFORE:    BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                Filed: August 27, 2020

Appellant, Andrew Poole, appeals from the order entered May 22, 2019, that denied his first petition filed under the Post Conviction Relief Act ("PCRA").[1] We affirm on the basis of the PCRA court opinion.

We previously set forth the factual background pertinent to this matter:

> On September 24, 2007, at approximately 3:00 p.m., a gunman with a bandana covering his face opened fire at the Tustin Recreation Center playground in the city of Philadelphia. Carl Wallace sustained multiple gunshot wounds but survived. Mehkee Gatewood, who was only 18 months old at the time of the shooting, was also struck in the foot and arm. Although no one was able to positively identify the gunman, he was seen running from the direction of the playground after the shooting. Appellant came to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541–9546.

believe that Tremayne Walker ("Walker") had told police that he was involved.

On November 11, 2007, not far from the Tustin playground at the corner of 61st and Oxford streets, Walker was shot to death. Before he died, Walker told multiple eyewitnesses, including Officer Robert Saccone, Alice Holmes ("Holmes" ), and his friend Terrell Watson ("Watson"), that it was [Appellant] who had shot him. [The victim] told Holmes, "If I die, Andrew Poole shot me." When Officer Saccone, who was only two blocks away at the time of the shooting and arrived immediately thereafter, asked Walker who shot him, Walker replied, "Drew Poole got me." Walker died from injuries sustained from three gunshot wounds.

. . .

On December 10, 2008, [Appellant] was found guilty of murder in the first degree for the shooting death of Walker, possessing an instrument of crime ("PIC"), firearms not to be carried without a license, and intimidation of a witness or victim. The jury was unable to reach a verdict on the charges related to the September 24, 2007 playground shooting.

On June 18, 2009, [Appellant] was sentenced to life imprisonment for first-degree murder, followed by 10 to 20 years for witness intimidation. Appellant's sentences on the remaining convictions were run concurrently.

*Commonwealth v. Poole*, 30 A.3d 527 (Pa.Super. 2011) (unpublished memorandum at *1-4). Appellant's conviction was largely based on testimony provided by Watson at the preliminary hearing, which stated that Walker had identified Appellant as his assailant immediately prior to his death. Watson's testimony during the preliminary hearing was read into the record at trial when Watson failed to appear to testify, and the Commonwealth could not locate him . . .

Appellant appealed his judgment of sentence, and we affirmed. *Poole*, *supra*. On March 1, 2012, the Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Poole*, 40 A.3d 1235 (Pa. 2012). On February 14, 2016, Appellant filed a counseled PCRA petition alleging that he received an affidavit from Watson in which Watson recanted his testimony indicating that Walker had identified Appellant as his shooter on

the night in question. Watson also averred that Officer Saccone coerced him to falsely identify Appellant as the shooter. Appellant appended Watson's affidavit to the PCRA petition and argued that his petition was timely filed pursuant to the newly-discovered fact and governmental interference exceptions to the PCRA's statutory time bar.

On August 16, 2016, the Commonwealth filed a motion to dismiss Appellant's PCRA petition, arguing that Appellant's petition was untimely, and that he failed to establish any of the exceptions to the PCRA's statutory time bar. On November 29, 2016, the PCRA court filed Rule 907 notice of its intent to dismiss Appellant's petition without a hearing, stating that Appellant's petition was untimely, and his issues were without merit. On February 7, 2017, the PCRA court granted the Commonwealth's motion to dismiss, and [a] timely appeal followed.

***Commonwealth v. Poole***, No. 760 EDA 2017, unpublished memorandum at

1-3 (Pa. Super. filed March 27, 2018).

On appeal, this Court vacated the PCRA order and remanded for further

proceedings, ***id.*** at 1, explaining:

A PCRA petition, including a subsequent or serial petition, must be filed within one year of the date that a defendant's judgment of sentence became final, unless an exception to the one-year time restriction applies. 42 Pa.C.S. § 9545(b)(1). This time bar is jurisdictional in nature. Whether a petition is timely is a matter of law. ***Commonwealth v. Hudson***, 156 A.3d 1194, 1197 (Pa.Super. 2017).

Appellant concedes that his petition is facially untimely. When a PCRA petition is facially untimely, the petitioner must plead and prove that one of the statutory exceptions applies. ***Id.*** If no exception applies, then the petition must be dismissed, as we cannot consider the merits of the appeal. ***Id.*** The PCRA reads, in relevant part:

(b) Time for filing petition. -

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment of sentence

becomes final, unless the petition alleges and the petitioner proves that:

> i.    the failure to raise the claim previously was the result of interference by the government officials with the presentation of the claim in violation of the Constitution or law of the United States;

> ii.    the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

> iii.    the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively. . . .

42 Pa.C.S. § 9545(b)(1) . . .

Appellant claims that the PCRA court erred in dismissing his petition since there remain genuine issues of material fact that, if true, would establish an exception to the PCRA's time bar. In his petition, Appellant pled facts implicating the newly-discovered fact and governmental interference exceptions to the PCRA time bar.

The newly-discovered fact exception, as set forth in § 9545(b)(1)(ii), requires a petitioner to plead and prove: (1) he did not know the fact(s) upon which he based his petition; and (2) he could not have learned those fact(s) earlier by the exercise of due diligence. ***Commonwealth v. Shiloh***, 170 A.3d 553, 558 (Pa.Super. 2017). Due diligence, in this context, obliges the petitioner "to take reasonable steps to protect [his] own interests." ***Id.*** (citation omitted). Nevertheless, it does not demand "perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." ***Id.*** (citation omitted). As such, "the due diligence inquiry is fact-sensitive and dependent upon the circumstances presented," and "[a] petitioner must explain why

- 4 -

she could not have learned the new fact earlier with the exercise of due diligence." ***Id.*** (citation omitted). . . .

Appellant also raises a claim that his petition satisfies the governmental interference exception to the PCRA's time bar. . . .

Appellant maintains that the Commonwealth's knowing reliance on purportedly perjured testimony constitutes a ***Brady*** violation,[1] and that Officer Saccone's actions can be imputed on the Commonwealth. . . .

> [1] ***Brady v. Maryland***, 373 U.S. 83 (1963).

Our High Court has previously noted that the "proper questions" with regard to this exception "are whether the government interfered with Appellant's ability to present his claim and whether Appellant was duly diligent in seeking the facts on which his claims are based." ***Commonwealth v. Edmiston***, 65 A.3d 339, 345 (Pa. 2013); ***Commonwealth v. Hawkins***, 953 A.2d 1248 (Pa. 2006) (noting "although a ***Brady*** claim may fall within the governmental interference exception, the petitioner must plead and prove that the failure to previously raise these claims was the result of interference by governmental officials, and that the information could not have been obtained earlier with the exercise of due diligence."). . . .

[O]ur review of the record reveals there are genuine issues concerning material facts that remain unresolved. Thus, we find that the PCRA court erred in dismissing Appellant's petition as untimely without first holding a hearing to determine whether Appellant satisfied an exception to the PCRA's statutory time bar. We direct the PCRA court to hold such a hearing, and to determine whether Appellant has pled and proven such an exception.

***Id.*** at 4-6, 11-12.

On remand, the PCRA court held an evidentiary hearing. In its opinion, the PCRA court fully and correctly set forth the testimony from the hearing. ***See*** PCRA Court Opinion, dated July 9, 2019, at 5-8 Therefore, we have no reason to restate it at length.

For the convenience of the readers, we briefly note that, on direct examination, Watson testified that he had joined the Army and left Philadelphia shortly after testifying at Appellant's preliminary hearing and that he had not kept in contact with Appellant, despite knowing Appellant for many years and being good friends with him. PCRA Court Opinion, dated July 9, 2019, at 5 (citing N.T., 5/16/2019, at 9-11, 13, 16, 35). "Watson, who did not appear at [A]ppellant's trial despite being subpoenaed to do so, explained that he did not appear because he knew he had testified falsely at [A]ppellant's preliminary hearing and did not want to commit perjury." *Id.* (citing N.T., 5/16/2019, at 9-10). However, "[o]n cross-examination, Watson stated that he remained in Philadelphia for several months after testifying at [A]ppellant's preliminary hearing before joining the Army and believed he left joined the Army in early 2009." *Id.* (citing N.T., 5/16/2019, at 23-24). Appellant's sister, Viola Poole, also testified.

> She stated that she ran into "P" in early March of 2015, when in the "old neighborhood" who asked her about her brother because she, "P", Watson, and appellant used to play basketball together. Ms. Poole asked "P" if he knew where Watson was and to give him her phone number. Watson thereafter called her and told her that the killing did not "go down like that" and that he was willing to speak to someone.

*Id.* at 7 (citing N.T., 5/16/2019, at 45-46).

> [A]t the conclusion of the hearing held on May 22, 2019, th[e PCRA c]ourt held that [A]ppellant had not exercised due diligence in filing his most recent PCRA petition and again dismissed the petition. Appellant thereafter filed a timely notice of appeal and a court-ordered 1925(b) Statement of Matters.

*Id.* at 2.

Appellant presents the following issues for our review:

I.     Whether the PCRA [court] erred in finding that [Appellant]'s PCRA petition was untimely when the evidence established that (1) the facts upon which his petition was based were unknown to [Appellant] and (2) could not have been discovered earlier by the exercise of due diligence and the PCRA petition was filed within sixty (60) days of the date on which the claim could have been presented?

[II.] Whether the PCRA [court] erred in finding the PCRA [petition] to be untimely when the evidence established that [Appellant] was entitled to the timeliness exception for governmental interference?

Appellant's Brief at 1-2 (unnecessary capitalization omitted).

"We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and are free of legal error." *Commonwealth v. Medina*, 209 A.3d 992, 996 (Pa. Super. 2019) (quoting *Commonwealth v. Brown*, 196 A.3d 130, 150 (Pa. 2018)).

As noted above, Appellant attempts to circumvent the time bar by asserting the exceptions under subsection 9545(b)(1)(i) and (ii). After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jeffrey P. Minehart, we conclude Appellant's issues merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of those questions. *See* PCRA Court Opinion, dated July 9, 2019, at 9–13 (finding: (I) a review of the record belies Appellant's assertion that he could not have learned "newly-discovered facts" earlier by the exercise of due diligence, because (A) had Appellant made "even a cursory attempt" to locate Watson, "that attempt

would have been successful" since (1) Appellant knew Watson for several years prior to the murder and could have attempted to contact him and/or found out where he was living directly or through mutual acquaintances at any time, (2) Appellant's PCRA petition is devoid of any indication that he took any steps to find Watson, including contacting Watson's grandmother who still lived in the neighborhood and knew where Watson was, and (3) nothing prohibited Ms. Poole or other family members or acquaintances from going to the "old neighborhood" before Ms. Poole did in early 2015, when she encountered "P"; and (B) contrary to Appellant's contention that he first learned of Watson's recantation from Watson's affidavit in January 2016, Appellant "could have discovered that Watson had the information he eventually provided as early as March 2015 when Watson received a telephone call from a friend indicating that [Ms. Poole] wanted . . . him to speak to an investigator"; and (II) Appellant cannot satisfy the governmental interference exception, because he (A) did not demonstrate that any governmental official precluded or prevented him from raising any claim and (B) was not duly diligent in seeking the facts on which his claims are based.).

For the reasons set forth above, Appellant failed to satisfy any of the exceptions to the PCRA time bar, and the PCRA court was without jurisdiction to review the merits of Appellant's claim and properly dismissed his petition. Having discerned no error of law, we affirm the order below. ***See Medina***,

209 A.3d at 996.  The parties are instructed to attach the opinion of the PCRA court in any filings referencing this Court's decision.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/27/20

Circulated 08/05/2020 08:14 PM

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

FILED

2019 JUL -9 PH 1:43

COMMONWEALTH OF
PENNSYLVANIA

          CP-51-CR-0002735-2008

VS.

ANDREW POOLE,
          APPELLANT



CP-51-CR-0002735-2008 Comm. v. Poole, Andrew
Opinion

8297668901

**OPINION**

MINEHART, J

## PROCEDURAL HISTORY

On December 10, 2008, following a jury trial presided over by this Court, appellant, Andrew Poole was convicted of first-degree murder, carrying a firearm without a license, intimidation of a witness, and possessing an instrument of crime. These charges stemmed from an incident that occurred on November 11, 2007, during which appellant shot and killed Mr. Tremayne Walker, who appellant believed had given police information about a shooting that occurred on September 24, 2007, inside a Philadelphia playground. On June 18, 2011, appellant received a sentence of life imprisonment on the first-degree murder conviction, a consecutive sentence of ten to twenty years' incarceration on the witness intimidation conviction, and concurrent sentences of varying lengths on the remaining charges. Appellant thereafter filed a direct appeal and on May 4, 2011, the Superior Court affirmed the judgment of sentence. Commonwealth v. Poole, 1795 EDA 2009. Appellant thereafter filed a petition for allowance of appeal in the Supreme Court of Pennsylvania, which denied the petition on March 1, 2012. Commonwealth v. Poole, 362 EDA 2011.

On February 14, 2016, appellant filed an untimely counseled petition for post-conviction collateral relief under the Post-Conviction Relief Act (hereinafter PCRA) 42 Pa.C.S. § 9541 et seq. In it appellant

1

sought relief based on a recent affidavit provided by Mr. Terrell Watson, wherein he averred that he had been forced by police to say that he heard Mr. Walker make dying declarations identifying appellant as the person who had shot him and that he had testified falsely at appellant's preliminary hearing that Walker identified appellant before he died because the police coerced him to do it. On November 29 2016, following a careful review of all of the filings and the entire record in the instant matter, this Court sent appellant a Pa.R.Crim.P. 907 Notice of Intent to Dismiss. On February 7, 2017, upon reviewing appellant's response to the 907 notice and the record, this Court dismissed appellant's PCRA petition without granting him an evidentiary hearing. Appellant thereafter filed a notice of appeal and a court-ordered Pa.R.A.P. 1925(b) Statement of Matters Complained of on Appeal.

On March 27, 2019, the Superior Court issued an order reversing this Court's order dismissing appellant's February 14, 2016, PCRA petition. The Superior Court also remanded the matter to this Court with directions that it hold an evidentiary hearing to determine whether appellant properly pleaded and proved that one of the exceptions to the PCRA's one-year time bar applied to excuse the late filing of his most recent PCRA petition. This Court thereafter conducted said hearings and at the conclusion of the hearing held on May 22. 2019, this Court held that appellant had not exercised due diligence in filing his most recent PCRA petition and again dismissed the petition. Appellant thereafter filed a timely notice of appeal and a court-ordered 1925(b) Statement of Matters.

**FACT OF THE CASE**

The instant matter had its genesis in an incident that occurred on September 24, 2007, during which a gun man wearing a mask began firing a hand gun into a crowd of people that included young children at a Philadelphia playground. A one-year old infant and a man named Carl Wallace were struck by the numerous bullets fired by the gunman. Witnesses could not identify the shooter, but appellant was observed running through an alley following the shooting. (N.T. 12/5/08, 21-27, 45-52, 61; 12/8/08, 119-121; 12/09/08, 4-5). Police investigation eventually focused on appellant who learned through the neighborhood grape vine that Tremayne Walker had informed police that appellant was responsible for

2

the playground shooting. (N.T. 12/5/08, 127-129, 136-137). Appellant cut off his hair braids following the shooting. (N/T/ 12/5/08, 46-57; 12/9/08, 8, 110-111, 115-116).

On November 11, 2007, at about 5:00 p.m., Mr. Walker was in the area of 61st and Oxford Streets, which was near the playground where the earlier shooting occurred, when appellant approached him and shot him three times outside a church where a prayer meeting and a wedding were taking place. Walker's injuries, which were to his liver, stomach, and left kidney and the blood vessels connected to those vital organs, were fatal but before he expired he told several persons that appellant was the person who shot him. (N.T. 12/5/08, 32, 34-35).[1]

Mr. Terrell Watson, a friend of Walker's for several years approached Walker after he was shot and asked him who had shot him. Watson, who was on his way to meet Walker after Walker called him, testified at appellant's preliminary hearing that Walker told him, "If I die, Andrew Poole did it." Walker also told Ms. Alice Holmes, someone who lived near the scene of the shooting and exited her home after the shots were fired observed Walker slide off of a car and drop to the street. Ms. Holmes went over to him and asked him who had shot him and he said, "Drew Poole... Andrew Poole... If I die, Drew Poole." " (N.T. 12/4/08, 67-69; 12/5/08, 126).[2]

Philadelphia Police Officers Michelle Proctor and Officer Robert Saccone arrived shortly after the shooting and Officer Saccone heard Mr. Walker tell Mr. Watson that appellant had shot him. Mr. Walker also directly told Officer Saccone that "Drew Poole got me" (N.T. 12/4/08, 88-90, 97).

The next day, Ms. Holmes was outside her residence when appellant approached and asked, "You know what happened?" She said, "Yeah, I know the guy that got shot... it was the boy who walks the dog." Ms. Holmes became worried because of the way appellant appeared to be holding something in his pocket, an object which Ms. Holmes believed to be gun. Appellant and Ms. Holmes then had a short

---

[1] Dr. Edwin Lieberman, the pathologist who performed the autopsy on the body of Mr. Walker testified that the wounds Mr. Walker suffered would not have prevented him from speaking or moving around after he was shot for a short period of time. (N.T. 12/5/08, 38).

[2] Watson did not appear at trial and was deemed unavailable. As a result, the Commonwealth was permitted to introduce the testimony Walker gave during appellant's preliminary hearing.

3

conversation during which appellant said, "You know what happen to people that give up information.... They get served, you know." Ms. Holmes thereafter backed away from appellant and entered her residence because she was afraid that appellant was going to shoot her. (N.T. 12/4/08, 71-74).

When Ms. Holmes went inside her home she observed a photograph of appellant her police officer daughter had placed there. Ms. Holmes told her daughter that the person in the photo looked like the male who had just threatened her, her daughter convinced her to give a statement to homicide detectives. Ms. Holmes acceded to the request and during her interview, Ms. Holmes participated in a photo identification session during which selected appellant's photo and indicated that it depicted the male who had threatened her. (N.T. 12/4/08, 74-75, 77).

Police obtained a warrant for appellant's arrest in November of 2007 but despite efforts to locate him conducted over the next couple of weeks they were unsuccessful. (N.T.12/8/08, 8-13). On December 19, 2007, Philadelphia police learned that a man named Jarrell Patterson, who was a fugitive sought in a murder case unrelated to the instant matter, was in the vicinity of the 5000 block of Market Street and that appellant and another fugitive named Tamyo Bullard might be there as well. Philadelphia Police Detective William McCusker went to the aforementioned location and saw Patterson exit a side entrance out of 5027 Market Street and then immediately turn around and go inside the building. The detective called for backup and when they arrived, they entered the building and eventually apprehended appellant and other persons. Appellant was taken into custody as he attempted to flee across a roof. He gave the police the name Jason Gates when asked to identify himself. During the operation police recovered several guns one of which testing revealed to be the gun fired at the playground and the location where Walker was shot and killed. (N.T. 12/4/08, 9-11 12/8/08, 18-20, 24, 31-35, 81, 83, 85-88).

Upon arriving at police headquarters police had appellant supply biographical information. When asked if his name, was in fact Jason Gates appellant stated, "It doesn't matter now, you got me. But how did you know all the information about me? There must be a lot of people snitching." He then provided police with his actual name, and said he resided at 1721 North 61st Street (N.T. 12/8/08, 44-52).

## FACTS FROM THE PCRA HEARING

During the evidentiary hearing, Terrell Watson testified that he testified for the Commonwealth at appellant's preliminary hearing. Soon after the preliminary hearing occurred, he stated that he joined the Army and left Philadelphia. (N.T. 5/16/19, 9-10). He stated that he was in the military for one year, eight months and was stationed in Texas. (N.T. 5/16/19, 10). After leaving the military, he did not return to Philadelphia and took up residence in Wilmington, Delaware. (N.T. 5/16/19, 10).

Watson stated that after leaving Philadelphia he did not keep in contact with appellant, someone he knew for many years and was good friends with him and knew him well. (N.T. 5/16/19, 11, 13, 16, 35). In 2015, he learned from a friend he identified only by the name "P" called him and told him that appellant's sister "Viola" wanted him to speak to a lawyer or investigator for purposes of an appeal. (N.T. 5/16/19, 11-13, 31). On January 15, 2016, Watson met with a defense investigator and assisted in the preparation of an affidavit wherein Watson averred that he lied during appellant's preliminary hearing that the victim identified appellant as the person who shot him before he died because a police officer told him that appellant needed to be off the street and it could only happen if he lied. (N.T. 5/16/19, 14-16). Watson indicated that he did not tell anyone that he had lied both in a statement to police and during the preliminary hearing before telling the investigator and that he decided to do so because he knew that his testimony at the preliminary hearing had been false. (N.T. 5/16/19, 16-17).

Watson, who did not appear at appellant's trial despite being subpoenaed to do so, explained that he did not appear because he knew he had testified falsely at appellant's preliminary hearing and did not want to commit perjury. (N.T. 5/16/19, 9-10). He thought that if he did not appear the Commonwealth could not prove its case but did not realize that it could introduce his prior testimony in evidence. (N.T. 5/16/19, 16).

On cross-examination, Watson stated that he remained in Philadelphia for several months after testifying at appellant's preliminary hearing before joining the Army and believed he left joined the Army in early 2009. (N.T. 5/16/19, 23-24). However, when pressed on when he entered the Army, he said that

5

he was not good with dates and it could have been in 2007 or 2008 "maybe two or three months after the preliminary." (N.T. 5/16/19, 28). During the period of time before he enlisted, persons in the neighborhood were calling him a snitch and although he testified that he stayed in the house during that period of time, he admitted going to classes at Community College of Philadelphia. (N.T. 5/16/19, 24-25).

Watson also indicated that he was only in the Army for a year, eight months because he was generally discharged under honorable conditions for having committed a theft. (N.T. 5/16/19, 25). He further testified that he told no one except his grandmother that he had enlisted a couple of weeks before he left. (N.T. 5/16/19, 25-27).

With regard to "P", Watson said he was a guy he knew from the neighborhood and played basketball with when they were young but had "no clue" what his actual name was. (N.T. 5/16/19, 29). Watson said that although he had many telephone numbers, "P' managed to get his phone number from Watson's Facebook account, which Watson thereafter deleted. (N.T. 5/16/19, 30). Watson also said that "P" was the only person he spoke to from the neighborhood and that he would "frequent the neighborhood here and there" but not "hang out" (N.T. 5/16/19, 30-31). Watson further added that he called appellant's sister approximately one month after hearing from "P". (N.T. 5/16/19, 31-32).

Watson stated that he knew that appellant had been convicted but could not recall how he knew that and even though he knew it, it did not prompt him to say that he had lied at appellant's preliminary hearing. (N.T. 5/16/19, 32-33). He further testified that when he and appellant played basketball together appellant and likely his sister "Vi" as well knew where he and his grandmother lived and that appellant's family also lived in that same neighborhood a couple of blocks from where appellant resided. (N.T. 5/16/19, 38-39).

On re-direct examination, Watson testified that the victim herein was his best friend and that when the Commonwealth came to his door to get him to take him to appellant's trial, he did not answer the door. (N.T. 5/16/19, 40).

Viola Poole, appellant's sister, testified that following appellant's conviction she did not try to make contact with Watson and did not expect to. (N.T. 5/16/19, 45). She stated that she ran into "P" in early March of 2015, when in the "old neighborhood" who asked her about her brother because she, "P", Watson, and appellant used to play basketball together. (N.T. 5/16/19, 45-46). Ms. Poole asked "P" if he knew where Watson was and to give him her phone number. (N.T. 5/16/19, 46). Watson thereafter called her and told her that the killing did not "go down like that" and that he was willing to speak to someone. (N.T. 5/16/19, 47). According to Ms. Poole, Watson did not relate anything about the case or what he was going to say and that she did not ask him what he meant when he said it did not "go down like that." (N.T. 5/16/19, 47-48, 59-60).

Ms. Poole added that she first learned that Watson had recanted his earlier account that the victim said that appellant shot him in appellant's PCRA attorney's office on May 13, 2019. (N.T. 5/16/19, 61-62). Prior thereto, she indicated that she did not know that Watson was willing to testify that the victim could not talk after he was shot in contravention of his previous preliminary hearing testimony. (N.T. 5/16/19, 49).

On cross-examination, Ms. Poole testified that she attended parts of appellant's trial but could not recall hearing a police officer say that the victim identified appellant by name as his assailant. (N.T. 5/16/19, 50-52). Ms. Poole, like Watson, did not know "P's" real name. (N.T. 5/16/19, 53). She also stated that she and her mother moved from the neighborhood in 2006 prior to the murder but that she still had friends residing in the neighborhood and that her father and appellant remained as residents in the neighborhood. (N.T. 5/16/19, 54-55).

With regard to Watson, Ms. Poole stated that she sought out Watson on a hunch and wanted to obtain his phone number because he failed to appear to testify at appellant's trial. (N.T. 5/16/19, 49). She indicated that she did not seek out anyone else and was unaware that Watson had a Facebook account that posted his phone number. (N.T. 5/16/19, 57-59).

7

Ms. Poole testified that she did not immediately tell appellant that she had spoken to Watson because she did not want to get his hopes up. (N.T. 5/16/19, 61). She also testified that she hired appellant's current counsel. (N.T. 5/16/19, 62).

Appellant began his testimony by stating that he did not know how to contact Watson and that he first learned that Watson had provided an affidavit in January of 2016. (N.T. 5/22/19, 5, 6). When asked when he first learned that the victim was unable to speak after he was shot, he said at the time of trial. (N.T. 5/22/19, 5). He added that his sister Viola did not tell him that she had spoken to Watson after talking to an investigator, he did not speak to the investigator himself before January 2016, and did not have access to Facebook while incarcerated. (N.T. 5/22/19, 6). Finally, in contradistinction to what he just testified to, he stated that he did not personally know whether or not the victim could speak after he was shot and while on the way to the hospital. (N.T. 5/22/19, 7).

On cross-examination, appellant stated that he first learned that the victim was unable to speak when he received Watson's affidavit and not as he just testified at the time of trial. (N.T. 5/22/19, 7-8). To explain the discrepancy, appellant stated that he had misunderstood the question. (N.T. 5/22/19, 8-9). Appellant also stated that he did not know what Facebook was and that he also did not know "P's" actual name and only played basketball with him. (N.T. 5/22/19, 11-12).

## DISCUSSION

In his 1925(b) statement appellant first asserts that this Court committed an abuse of discretion by finding that he did not exercise due diligence herein because he established that he did not know of the information provided by Watson with regard to whether the victim was able to speak after he was shot and that he could not have learned of that information by exercising due diligence and, therefore, that he met the exception to the one-year time bar found at 42 Pa.C.S. § 9545(b)(1)(ii). This Court, quite obviously, does not agree and suggests that this claim be found lacking in merit.

In Commonwealth v. Monaco, 996 A.2d 1076 (Pa. Super. 2010), the Superior Court stated:

8

> The timeliness exception set forth in Section 9545(b)(1)(ii) requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence. Commonwealth v. Bennett, 593 Pa. 382, 395, 930 A.2d 1264, 1271 (2007). Due diligence demands that the petitioner take reasonable steps to protect his own interests. Commonwealth v. Carr, 768 A.2d 1164, 1168 (Pa.Super.2001). A petitioner must explain why he could not have obtained the new fact(s) earlier with the exercise of due diligence. Commonwealth v. Breakiron, 566 Pa. 323, 330-31, 781 A.2d 94, 98 (2001); Commonwealth v. Yarris, 557 Pa. 12, 29, 731 A.2d 581, 590 (1999). This rule is strictly enforced. See Vega, supra at 718.

Monaco, 996 A.2d at 1080. See also Commonwealth v. Bennett, 930 A.2d 1264, 1270-72 (Pa. 2007). The determination of timeliness does not require a merits analysis. See id.; see also Commonwealth v. Abu-Jamal, 941 A.2d 1263, 1268 (Pa. 2008); Commonwealth v. Brown, 141 A.3d 491, 500 (Pa. Super. 2016).

Instantly, appellant asserted, *inter alia*, that he exercised due diligence because he could not have known that Watson was going to recant his prior testimony and what was in his prior statement to police until he provided his affidavit to appellant. A review of the record belies appellant's assertion first because appellant knew Watson for several years prior to the murder herein and had been, according to Watson, a good friend of his and thus, appellant could have attempted to contact him or actually contacted him or find out where he was living directly or through mutual acquaintances at any time well before the date Watson provided the affidavit. Moreover, appellant's PCRA petition is devoid of any indication that he took any steps to find Watson, including contacting Watson's grandmother who still lived in the neighborhood and obviously knew where he was . For this reason alone, appellant failed to establish that he acted with due diligence.

Moreover, appellant's sister found "P" because she was in the "old neighborhood." Certainly nothing prohibited her or other family members or acquaintances from going there before Viola did in early 2015 and had she or other persons associated with appellant done so, it is reasonable to assume that she and/or they would have seen old friends and associates that could have led them to people who knew Watson and could have provided information about where he could be located.

9

Next, appellant testified that he was aware that the victim was physically unable to speak after he was shot at the time his trial occurred. Thus, appellant certainly had an obligation to take steps to find his good friend Watson to ascertain what he knew about the victim's ability to speak well prior to the time Watson gave his affidavit.[3] Although appellant tried to retract that testimony, this Court found his explanation that he did not understand the question posed by his attorney not believable because the question was not complicated and appellant answered it immediately without hesitation.

Also, this Court did not find credible the explanation provided by Watson and appellant's sister that he was located because appellant's sister serendipitously saw "P" while visiting the "old neighborhood." Frankly, this Court found entirely fatuous and not credible that the entire investigation commenced when Viola saw "P." In fact, this Court believes that there is no "P" because no one could provide his name despite the fact that "P" was someone Watson, Viola, and appellant played basketball with regularly.

In addition, this Court determined, based on Watson's testimony, that had appellant made even a cursory attempt to locate Watson, that attempt would have been successful. Watson testified that he resided in the neighborhood following the shooting for several months and that after he joined the Army he visited his grandmother on occasion who still lived in the neighborhood where the incident occurred and appellant resided with his father before appellant was incarcerated. Although incarcerated, appellant could have, directly or through others, contacted Watson's grandmother after he was convicted in an attempt to locate Watson to confirm Appellant's knowledge that the victim was rendered incapable of speaking as a result of having been shot. The concept of reasonable diligence is relevant where a petitioner fails to investigate or question a potential witness with whom he has a close, amicable relationship. Commonwealth v. Parker, 431 A.2d 216, 218 (Pa. 1981). See also Padillas, 997 A.2d at 367 (citing Commonwealth v. Chambers, 599 A.2d 630, 642 (Pa. 1991), cert. denied) (a defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from

---

[3] Watson stated several times that he and appellant were good friends. (N.T. 5/16/19, 11, 13, 16, 35).

10

that source constitutes newly discovered evidence); Commonwealth v. Crawford, 427 A.2d 166, 175 (Pa. Super. 1981) (a defendant cannot claim he has discovered new evidence simply because he had not been expressly told of that evidence).

It is further noted that the sixty-day filing requirement is not measured from the time a petitioner first obtains new information. Commonwealth v. Marshall, 947 A.2d 714, 720 (Pa. 2008). Instead, the law requires a petitioner to file his petition within sixty days of the date that the claim first could have been presented if he or she had exercised reasonable diligence. Id. If a petitioner completely "fails to explain why, with the exercise of due diligence, the claim could not have been filed earlier," then he or she has "fail[ed] to satisfy the sixty-day requirement." Id. (citing Commonwealth v. Breakiron, 781 A.2d 94, 98 (2001)). See Commonwealth v. Padillas, 997 A.2d 356, 364 (Pa. Super. 2010) (holding that a "defendant who fails to question an obvious, available source of information cannot later claim evidence from that source constitutes newly discovered evidence.").

Here, appellant testified that he first learned of the information Watson provided when he received Watson's affidavit in January of 2016. Viola also testified that she did not know what Watson set forth in the affidavit until a couple of days before the first hearing herein on May 16, 2019, and that she did not tell appellant that she had found Watson. This Court did not believe this testimony or Viola's testimony that she just ran into "P." Viola testified that she paid for the investigation and thus, it makes absolutely no sense that she would not have immediately wanted to know what, if anything, Watson said and that she would not have immediately told her brother about what Watson said. The record shows that Watson agreed well prior to signing his affidavit to provide the information he set forth in the affidavit he signed in January of 2016. Based on when Watson gave his affidavit and this Court's disbelief of the testimony that Viola did not know what Watson said and appellant's claim that he first learned of the affidavit in January of 2016, this Court concluded that appellant failed to meet his burden of proving an exception to the PCRA's time-bar because his assertion that he did not know of the affidavit until January of 2016 was not believable. See Commonwealth v. Albrecht, 994 A.2d 1091, 1094 (Pa. 2010) (appellant did not satisfy

11

requirement for time-bar exception where he did not state when he first learned of the facts underlying his PCRA claims); Commonwealth v. Breakiron, 781 A.2d 94, 98 (Pa. 2001) (petition untimely where appellant failed to offer reasonable explanation why, with due diligence, new information could not have been obtained earlier); Commonwealth v. Taylor, 933 A.2d 1035, 1041 (Pa. Super. 2007) (to satisfy requirements of §9545(b)(1)(ii), "[a] petitioner must... explain why his asserted facts could not have been ascertained earlier with the exercise of due diligence"), alloc. denied, 951 A.2d 1163 (Pa. 2008); Commonwealth v. Holmes, 905 A.2d 507, 510–511 (Pa. Super. 2006), appeal denied, 917 A.2d 845 (Pa. 2007) ("While Holmes' petition was admittedly filed within sixty days of the date of the Fauntleroy affidavit, there is absolutely no indication that Mr. Fauntleroy drafted the affidavit on the same day that he first approached Appellant and revealed to him the new information. Thus, Holmes failed to demonstrate the predicate requirement that the instant claim was raised within sixty days of the date it first could be presented, and, therefore, he did not sustain his burden of pleading and proving that the after-discovered evidence exception permits him to circumvent the statutory time-bar.").

In addition, appellant could have discovered that Watson had the information he eventually provided as early as March of 2015 when Watson received a telephone call from a friend indicating that appellant's sister wanted to him to speak to an investigator. This Court concluded that had appellant and/or members of his family made reasonable attempts to find Watson following appellant's conviction, they too could have found Watson as well. The concept of reasonable diligence is relevant where a petitioner fails to investigate or question a potential witness with whom he has a close, amicable relationship. Commonwealth v. Parker, 431 A.2d 216, 218 (Pa. 1981). See also Padillas, 997 A.2d at 367 (citing Commonwealth v. Chambers, 599 A.2d 630, 642 (Pa. 1991), cert. denied) (a defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence); Commonwealth v. Crawford, 427 A.2d 166, 175 (Pa. Super. 1981) (a defendant cannot claim he has discovered new evidence simply because he had not been

12

expressly told of that evidence).  Thus, for all of the foregoing reasons, it is suggested that this Court's ruling declaring that appellant did not exercise due diligence be affirmed.

With regard to the government interference exception, it was deemed not applicable because it is wholly dependent on Watson's affidavit for its validity. Because appellant did not exercise due diligence to obtain the information Watson provided it was clear that he could not meet the sixty day limitation set forth in the PCRA with respect to his governmental interference claim. Moreover, appellant did not demonstrate that any governmental official precluded or prevented him from raising the claim given that Watson did eventually provide the information, which he himself said he gave because he "felt bad." Finally, the exception does not apply because the defense presented no evidence other than Watson's that a police officer lied

Accordingly, this Court respectfully suggests that its ruling finding appellant's petition time-barred be affirmed.

BY THE COURT:

DATE: 7/9/19

HON. JEFFREY P. MINEHART

13

## CERTIFICATION OF SERVICE

I, Stacy Bauer, secretary to the Honorable Jeffrey P. Minehart hereby certify that on the _____ day

of July, 2019, a true and correct copy of the attached opinion was served upon the following:

Cheryl J. Sturm, Esquire
387 Ring Road
Chadds Ford, PA 19317

Lawrence J. Goode, Esquire
Chief-Appeals Unit
Phila. District Attorney's
Office
Three South Penn Square
Philadelphia, PA 19107

Stacy Bauer
Stacy Bauer

14